Irving MILLER, Plaintiff,

v.

GENERAL OUTDOOR ADVERTISING CO., Inc., Gamble-Skogmo, Inc. and Alleghany Corporation, Defendants.

United States District Court
S. D. New York.

Dec. 2, 1963.

Kaufman, Taylor & Kimmel, New York City, for plaintiff, Stanley L. Kaufman, Shephard S. Miller, New York City, of counsel.

Holtzmann, Wise & Shepard, New York City, for defendant Gamble-Skogmo, Inc., James W. Deer, Irving S. K. Chin, New York City, of counsel.

WYATT, District Judge.

This is a motion by defendant Gamble-Skogmo, Inc. ("Gamble") for summary judgment (Fed.R.Civ.P. 56) in an action for alleged "short swing" profits under Section 16(b) of the Securities and Exchange Act of 1934 (15 U.S.C. § 78p(b); the "Act").

The "issuer" is Alleghany Corporation; the action is brought in its behalf by a stockholder and Alleghany is named as a defendant. Jurisdiction is given to this Court by Section 27 of the Act (15 U.S.C. § 78aa).

Alleghany is a Maryland corporation which has outstanding about 9,800,000 shares of common stock; this stock is registered on the New York Stock Exchange, which is a "national securities exchange" (15 U.S.C. § 78p).

Alleghany owns about 47.8% of the voting common stock of Investors

Diversified Services, Inc., a Minnesota corporation, which has investment advisory and distribution contracts with five mutual fund companies.

The movant Gamble is a Delaware corporation.

Defendant General Outdoor Advertising Co., Inc. ("Advertising") is a New Jersey corporation, about 51% of the stock of which is owned by Gamble. General Outdoor Realty Corporation ("Realty") is a Nevada corporation, all of the stock of which is owned by Advertising.

Murchison Brothers ("Murchison") is a partnership of C. W. Murchison, Jr. and John D. Murchison.

Under date of October 4, 1962, Gamble agreed to buy from Murchison 750,000 shares of Alleghany for $10 per share and at the same time represented that Realty would also buy from Murchison 750,000 shares of Alleghany at the $10 price per share.

Under date also of October 4, 1962, a written "agreement of put and call" was made between Murchison and Gamble. Under this agreement

(a) Gamble had an option, exercisable on or before May 31, 1963, to buy from Murchison 2,000,000 shares of Alleghany at $10 per share (thus, a "call" on the stock);

(b) Murchison had an option, exercisable between June 1 and June 30, 1963, to require Gamble to buy from Murchison 2,000,000 shares of Alleghany (thus, a "put" on the stock); and

(c) Murchison had the further option, on exercise by Gamble of the "call" or on exercise by Murchison of the "put", to deliver less than 2,000,000 shares of Alleghany but not less than 1,500,000 shares.

The contract of purchase was carried out on October 5, 1962. Gamble and Realty each took delivery on that day of 750,000 shares of Alleghany and paid therefor $10 per share in cash. As a result of these purchases Gamble became "directly or indirectly the beneficial

owner of more than 10 per centum" of Alleghany stock (in fact, the owner of slightly more than 15.3%); under Section 16(a) of the Act Gamble thus became liable for "any profit realized" from any of the transactions specified in Section 16(b) of the Act.

On October 9, 1962, Bertin C. Gamble, Chairman of the Board of Directors of Gamble, and James W. Deer, Esq., an attorney for Mr. Gamble, were elected directors of Alleghany. It appears that there were ten directors. The names of the other eight directors of Alleghany are not given but they must have been C. W. Murchison, Jr. and John D. Murchison with their associates and supporters. This can be assumed because we are told that the eight directors had been elected in May 1961 after a successful proxy contest conducted by the Murchisons. There is also an oblique reference in the affidavit of Herbert J. Seakwood (page 3) indicating that the two Murchisons were directors of Alleghany.

Under date of May 29, 1963, the "call" of Gamble was extended to June 30, 1963 and the "put" of Murchison was extended to July 31, 1963.

Under date of June 28, 1963, the "call" of Gamble was extended to July 31, 1963. There was no similar extension of the "put" of Murchison.

Under date of July 1, 1963, Gamble made three written agreements with Allan P. Kirby, Coral Ridge Properties, Inc. ("Coral Ridge"), and Allied Properties ("Allied"), respectively, to sell them shares of Alleghany at $10.50 per share as follows:

| | |
|---|---|
| Allan P. Kirby | 1,000,000 shares |
| Coral Ridge | 100,000 shares |
| Allied | 500,000 shares |

The obligation of Gamble to sell was conditioned on approval by stockholders in the five mutual fund companies of the investment advisory and distribution contracts with Investors Diversified Services, Inc. after notification to such stockholders of the agreement by Gamble to sell 1,600,000 Alleghany shares to Kirby, Coral Ridge and Allied.

This condition was undoubtedly made because of Section 205 of the Investment Advisers Act of 1940 (15 U.S.C. § 80b–5) which in substance requires the "consent of the other party to the contract" when there is any "assignment" of the contract by the "investment adviser".

Movant Gamble asserts without contradiction that this condition was substantial and beyond its control in that the five mutual fund companies have numerous stockholders and large assets; presumably there is no single or group control of these five mutual fund companies and it is not suggested that Gamble, Murchison, Kirby, Coral Ridge or Allied had any control of them.

On July 5, 1963, the present action was commenced. The complaint merely alleges that "in or about July 1963" Gamble bought "approximately 1,900,000" Alleghany shares and that "on or about July 3, 1963" Gamble sold "approximately 1,600,000" Alleghany shares. As amplified by the affidavit for plaintiff, the theory of the action appears to be that the June 28, 1963 extension of the "call" of Gamble was a "purchase" at $10 per share within the meaning of Section 16(b) of the Act and that the July 1, 1963 agreements with Kirby, Coral Ridge and Allied represented a "sale" at $10.50 per share within the meaning of Section 16(b), thus producing an apparent "profit realized" of $0.50 per share for which Gamble is said to be liable.

Under date of July 29, 1963, the "call" of Gamble was extended to October 15, 1963 and the "put" of Murchison was extended to October 25, 1963. In the extension agreement it was provided that if before October 1, 1963 the five mutual fund companies bound by contract to Investors Diversified Services, Inc. had given notice of meetings of their shareholders to approve "the re-execution of such investment advisory contracts" then

(a) the "call" of Gamble should be extended to ten days after the conclusion of such shareholder meetings but not later than to November 15, 1963; and

(b) the "put" of Murchison should be extended to twenty days after the conclusion of such shareholder meetings but not later than to November 25, 1963.

After the argument of this motion on October 9, 1963, the Court was informed that stockholders of four of the mutual fund companies had approved the investment advisory and distribution contracts with Investors Diversified Services, Inc. after notification of the July 1, 1963 agreement for sale by Gamble.

There is no issue as to any of the facts set out nor any genuine issue as to any material fact.

While reference has been made to events occurring after the filing of the complaint, they can have no effect on the decision of the present motion. It is irrelevant to speculate on what liability of Gamble might arise if the October 4, 1962 "agreement of put and call" were to be carried out in whole or in part and if further transactions were to take place between the parties.

The sole question here is this: was there a "purchase" by Gamble of an "equity security" of Alleghany within the meaning of Section 16(b) when its "call" was extended under date of June 28, 1963?

If the answer is "no", then judgment must go for Gamble because it is essential to the case for plaintiff that there be a "purchase" of an "equity security" to be matched against the claimed July 1, 1963 "sale" by Gamble.

■ The moving defendant Gamble is entitled to a judgment as a matter of law because the June 28, 1963 extension of its "call" was not a "purchase" of an Alleghany "equity security" within the meaning of Section 16(b).

Plaintiff makes no serious claim here that the "agreement of put and call" or any extension thereof was a "purchase" of Alleghany *stock*. It is true that on occasion plaintiff refers to the extensions as "binding contracts of purchase and sale" (opposing affidavit, page 11) but this is not pressed and cannot be taken seriously, having in mind Silverman v.

Landa, 2 Cir., 306 F.2d 422 (1962) with which counsel for plaintiff shows a close acquaintance.

The argument for plaintiff is a different one. It is:

    a. that the "purchase" by Gamble on June 28, 1963 was not of Alleghany *stock* but of an "equity security" of that "issuer", namely, an *option* which is encompassed by the statutory language "warrant or right to subscribe" (15 U.S.C. § 78c (a) (11)); and

    b. that this purchase of the *option* is to be matched against the July 1, 1963 sale of *stock*, which matching results in short-term transactions for which there is liability under Section 16(b).

It is assumed, but without deciding, that there was a purchase by Gamble of something under date of June 28, 1963. In fact, that there was any purchase on that date is not immediately apparent. There was no express agreement for an option on that date but merely an extension of the option period of an agreement made more than six months before. The argument for plaintiff is that the extension of June 29, 1963 amounted to the acquisition of a new option on that date. The argument for movant is that one among the many terms of the original option agreement was changed on June 28, 1963, the effect being the same as if the original option had contained on October 4, 1962 the changed term.

Assuming, therefore, that there was a purchase by Gamble on or under date of June 28, 1963 of something, was this something an "equity security" within the meaning of Section 3(a) (11) and 16(b) of the Act?

The something acquired by Gamble was a "call" on Murchison for Alleghany stock and this "call" or option was nontransferrable by Gamble. The "agreement of put and call" specifically provided in Section 9 that "the rights and obligations on the part of Gamble hereunder are personal to it and the same may not be assigned by Gamble to any other party

without the prior written consent of Murchison".

■ The definition of "equity security" in the Act is in relevant part as follows (Section 3(a) (11); 15 U.S.C. § 78c(a) (11)):

> "any stock or similar security; or any security convertible * * * into such a security, or carrying any warrant or right to subscribe to or purchase such a security; or any such warrant or right * * *".

The word "warrant" and the words "right to subscribe" while representing the same idea may not as a technical matter refer to the same "security".

■ The term "warrant" may broadly include a "right to subscribe" but it includes more. The usual "warrant" is "issued with bonds and shares of stock. This combination is intended to give the investor the privilege of retaining the speculative or conversion element of the convertible security with the investment element as a single investment, or else separating the two and selling one or the other on the open market". 1 Dewing, The Financial Policy of Corporations (5th ed.) 265. This usual type is sometimes called a "detachable warrant".

■ The "right to subscribe" properly refers to the right given by an issuer to its stockholders to buy additional stock; if the corporation is to issue new stock often these rights are required by law to be given to the old stockholders because they have preemptive rights to the new stock. The "right" or "right to subscribe" given by the issuer is described as follows (2 Dewing, above cited, 1141):

> "The normal procedure of a corporation wishing to distribute new shares of stock or new bonds to its old stockholders is to offer them the privilege of subscribing to these new securities in a certain proportion to the shares already held, at a price distinctly below the prevailing market price. The privilege attaching itself to each old share is called a 'right'."

The distinction in the terms has been thus explained (1 Dewing, above cited, 265):

> "The term 'warrant' is used generically to cover the class of securities representing a certificate of call— a bearer's option—which enables the holder to demand the delivery of stock according to definite and clearly defined terms. The term 'right' is sometimes used as synonymous with warrant; but this use is objectionable because the word right has long been used to designate a stockholder's privilege to subscribe to new stock."

■ Both a "warrant" and a "right to subscribe", as normally issued by corporations, are negotiable and on that account can be and are traded freely in financial markets, often being listed on securities exchanges.

"Warrant" is defined in a dictionary as follows (Webster's Third New International Dictionary, page 2577):

> "an instrument issued by a corporation giving to the holder the right to subscribe to the capital stock of the corporation at a fixed price either for a limited period or perpetually".

"Right" is defined in the same dictionary (page 1955) as follows:

> "a privilege given stockholders of a corporation to subscribe pro rata to a new issue of securities generally at a price below that prevailing in the market * * * the negotiable certificate evidencing such privilege * * *".

Judge Tyler has recently had occasion to describe a particular "warrant" (Entel v. Guilden, et al., 223 F.Supp. 129):

> "The warrants are negotiable; indeed, they are listed and actively traded on the American Stock Exchange and are also traded on the Pacific Coast Stock Exchange."

And Professor Loss has said in this connection as to "warrants and rights"

(1 Loss, Securities Regulation (2d ed.) 467):

"This part of the definition clearly covers the ordinary warrants or rights to purchase shares of the same corporation—or occasionally a related corporation—which are customarily traded both on the exchanges and in the over-the-counter market."

It will thus be seen that warrants and rights have certain specific characteristics important to the present problem: (1) they are issued by the corporation, (2) they are negotiable, and (3) they are traded as securities.

The "agreement of put and call" with which we are concerned has none of these characteristics. It is not issued by Alleghany but by Murchison, even more of an insider than Gamble. cf. Put and Call Options under Section 16 of the Securities Exchange Act, 69 Yale Law Journal at 873–874 (1960). It is not negotiable or transferrable; there is a provision against transfer. It cannot be traded as a security on an exchange or any place else; this follows from its non-negotiable character and also from the fact that it is one of a kind.

The "agreement of put and call" thus could never be a "security" as that term is defined in the Uniform Commercial Code § 8–102 (Proposed Final Draft 1950):

an "instrument which is issued in bearer or registered form * * * of a type commonly dealt in upon securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment".

This definition was quoted by our Court of Appeals in Silverman v. Landa, above cited (306 F.2d at 424).

The "agreement of put and call" cannot be an "equity security of such issuer" within the meaning of Section 16(b) and summary judgment must go for the movant.

There is no occasion to consider the interesting question whether a *transferrable* option not issued by the corporation is an "equity security of such issuer" within the meaning of Section 16(b). See 2 Loss, above cited, 1057–1082; 69 Yale Law Journal, above cited, 868–894 (1960).

Finding that there is no genuine issue as to any material fact and that defendant Gamble-Skogmo, Inc. is entitled to a judgment as a matter of law, the motion for summary judgment is granted and the Clerk is directed to enter judgment hereon in favor of defendant Gamble-Skogmo, Inc. dismissing the action as against said defendant.

So ordered.